**UNITED STATES of America, Plaintiff–Appellee,**

v.

**LOCAL 1804–1, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL–CIO; John Barbato; George Barone; John Bowers; George Bradley; Thomas Buzzanca; Santo Calabrese; Ronald Capri; Donald J. Carson; Harry Cashin; James J. Cashin; Joseph Colozza; Vincent Colucci; James Coonan; Michael Coppola; Harold Daggett; Doreen Supply Company, Inc.; Tino Fiumara; Anthony Gallagher; Robert Gleason; John Gotti; Leroy Gwynn; ILA Local 1588; ILA Local 1588 Executive Board; ILA Local 1804–1; ILA Local 1804–1 Executive Board; ILA Local 1809; ILA Local 1809 Executive Board; ILA Local 1814; ILA Local 1814 Executive Board; Anthony Anastasio; ILA Local 1909; Blase Terraciano; ILA Local 1909 Executive Board; ILA Local 824; ILA Local 824 Executive Board; Kevin Kelly; Joseph C.F. Kenny; George Lachnicht; Gregory Lagana; Frank Lonardo; Venero Mangano; James McElroy; Metropolitan Marine Maintenance Contractors; Carlos Mora; New York Shipping Association; Nodar Pump Repair, Inc.; Ralph**

Perello; Louis Pernice; Anthony Pimpinella; John Potter; Douglas Rago; Joseph Randazzo; Thomas Ryan; Anthony Salerno; Dominick Sanzo; Frank Scollo; Anthony Scotto; Alfred Small; Defendants,

New York Shipping Association,
Defendant–Appellee,

Anthony Ciccone, Defendant–Appellant.

No. 556, Docket 94–6152.

United States Court of Appeals,
Second Circuit.

Argued Oct. 11, 1994.

Decided Jan. 5, 1995.

Kay K. Gardiner, Asst. U.S. Atty., New York City (Mary Jo White, U.S. Atty., New York City, Claude M. Millman, Asst. U.S. Atty., Gabriel W. Gorenstein, Asst. U.S. Atty., on the brief), for plaintiff-appellee U.S.

C. Peter Lambos, New York City (Donato Caruso, Lambos & Giardino, New York City, on the brief), for defendant-appellee New York Shipping Ass'n, Inc.

Richard W. Brewster, New York City (Kaplan & Katzberg, New York City, on the brief), for appellant Ciccone.

Before: NEWMAN, Chief Judge, WALKER and CALABRESI, Circuit Judges.

CALABRESI, Circuit Judge:

In this lengthy postscript to a protracted civil RICO case, defendant Anthony Ciccone appeals from a finding of contempt entered on April 29, 1994, by the United States District Court for the Southern District of New York (John S. Martin, Jr., Judge), and from an enforcement order dated May 24, 1994. The civil contempt finding rested on the District Court's conclusion that Ciccone had violated two provisions of a consent decree entered into by Ciccone and a number of his co-defendants. First, the Court found that Ciccone violated the portion of the decree that prohibited him from knowingly and improperly associating with organized crime figures or with individuals barred from participation in union affairs. Second, the Court determined that Ciccone applied for a pension for which he was ineligible under the terms of the consent decree. Because we interpret the consent decree differently from the District Court, we vacate those portions of the Court's orders that relate to Ciccone's associations with individuals allegedly of prohibited status, and we affirm those portions of the Court's orders that deal with the pension issue on somewhat different grounds.

## BACKGROUND

The consent decree that Ciccone signed arose out of a wide-ranging, multi-defendant civil action under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, in which the government sought to eradicate the influence of organized crime in local unions affiliated with the International Longshoremen's Association ("ILA") on the New York/New Jersey Waterfront. Although the government attempted to prove the existence of an overarching RICO enterprise, in practical effect the government's case was broken into relatively discrete units, each targeting a different local union and a different location on the Waterfront. In the portion of the case relevant here, the government tried to prove that Ciccone, an ILA official and a special administrator of Local 1814 in Brooklyn, was affiliated with the Gambino crime family. The government alleged that Ciccone abused his position as special assistant to Local 1814 to embezzle funds from the local, and that Ciccone ran gambling and loansharking rings

from a social club located near Local 1814's offices.

On December 17, 1991, during the course of the trial and after the government presented substantial evidence concerning Ciccone's ties to organized crime and misuse of his union position, Ciccone and a number of his co-defendants agreed to the entry of a consent decree ending their trial. In the consent decree, Ciccone agreed to significant restrictions on his future activities and associations. In particular, under Paragraph 2(a) of the decree, Ciccone agreed to be enjoined

> from committing any act of racketeering activity, as defined in 18 U.S.C. § 1961, and from knowingly and improperly associating with any member or associate of any La Cosa Nostra crime family or any other criminal group, or with any person prohibited from participating in union affairs.

Ciccone further agreed, in Paragraph 9(b) of the decree, to disassociate himself from Local 1814 and the ILA, with limited exceptions relating to job benefits:

> On or before March 30, 1992, Anthony Ciccone shall resign from any and all positions, whether elective or appointive, that he currently holds in Local 1814, the ILA, or any other ILA-affiliated entity, including any ILA local union, any ILA district, and any pension or other benefit plan or fund affiliated with any ILA entity. Ciccone shall not thereafter seek or accept any such position in any such entity or resume any such membership, and shall be permanently barred from any employment by or other participation in the affairs of any entity doing business on the Waterfront. Nothing in this subparagraph, however, shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo Agreement, subject to the authority of the Monitor herein. Nothing in this provision shall impair Ciccone's entitlement to any welfare or vested pension or severance benefits.

In November 1993, the government moved for an order to show cause why Ciccone should not be held in contempt for violations of the consent decree. The government's motion had two bases. First, the government contended that Ciccone violated Paragraph 2(a) by maintaining regular, systematic contacts both with members of the Gambino crime family and with individuals who had been ordered to refrain from participation in union affairs. In support of its contention, the government submitted an affidavit of a federal agent who had conducted an ongoing surveillance of Ciccone. The affidavit and supporting exhibits detailed numerous contacts between Ciccone and alleged organized crime figures, as well as contacts between Ciccone and individuals barred from participation in union affairs. Many of these contacts occurred at Ciccone's social club and at other social clubs reputed to be gathering points for Gambino family associates; on at least one occasion, Ciccone was observed leaving Local 1814's offices in the company of an alleged Gambino soldier. In response to the government's evidence, Ciccone denied generally that the individuals with whom he had been seen were involved in organized crime; he did not dispute, however, that he met on a number of occasions with individuals barred from involvement in the union. Ciccone's principal contention was that even if he had knowingly associated with organized crime figures and individuals prohibited from taking part in union affairs, there was no evidence that his association with those individuals was improper.

Second, the government contended that Ciccone violated Paragraph 9(b) by seeking a benefit from the union to which he was not entitled. In late March 1992, Ciccone applied to the New York Shipping Association ("NYSA")—ILA pension fund for a "window period pension." The window period pension, an early retirement incentive plan, had been available to active employees over the age of 55, with 25 or more years of experience, who withdrew from the industry between December 1, 1990, and January 31, 1991. Ciccone, who had the requisite experience and was over the age of 55 throughout this period, did not withdraw from the industry during the window period, but rather remained in the industry until he was required to withdraw, pursuant to the consent decree, in March 1992. Although Ciccone's

application therefore was untimely, Ciccone sought a waiver. Ciccone's application was denied by the pension fund trustees and, after a split vote on appeal to the NYSA–ILA Contract Board, was to be submitted to arbitration. The government then obtained an injunction against the arbitration and filed its contempt motion, contending that Paragraph 9(b) clearly established Ciccone's ineligibility for the window period pension, and that his application and appeal constituted improper participation in union affairs. Ciccone responded that Paragraph 9(b) established his eligibility for the pension, or at least that the paragraph was ambiguous.

On review of the government's motion and Ciccone's response, the District Court concluded that Ciccone had violated both Paragraph 2(a) and Paragraph 9(b) of the consent decree. After seeking further input from both the government and Ciccone concerning the appropriate remedy, the Court ordered that Ciccone not associate, knowingly and improperly, with any member or associate of any La Cosa Nostra crime family or other criminal group. The Court specifically identified over 150 individuals as organized crime figures with whom Ciccone was not to associate, knowingly and improperly. The Court also repeated the consent decree's ban on knowing and improper association with individuals barred from involvement in union affairs, and further ordered Ciccone not to associate with any member, officer, or employee of the ILA or any of its affiliates. In addition, the Court ordered Ciccone not to frequent certain locations associated with either the ILA or organized crime. Finally, the Court ordered Ciccone to withdraw his application for the window period pension. The order stated that future violations would "subject Ciccone to escalating fines or imprisonment." From this order, and from the order concluding that Ciccone had violated the consent decree, Ciccone now appeals.

## DISCUSSION

### 1. *Standard of Review*

We begin by addressing the standard that we apply in reviewing the District Court's conclusions. This Court has set forth an array of standards that are relevant to different issues relating to consent decrees. The interpretation of the terms of the consent decree is subject to *de novo* review. *United States v. O'Rourke,* 943 F.2d 180, 186 (2d Cir.1991). The District Court's factual findings are accepted unless they are shown to be clearly erroneous. *EEOC v. Local 580, Int'l Ass'n of Bridge Ironworkers, Joint Apprentice–Journeyman Educ. Fund,* 925 F.2d 588, 594 (2d Cir.1991); *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir.1989), *cert. denied,* 494 U.S. 1030, 110 S.Ct. 1478, 108 L.Ed.2d 615 (1990). The court's ultimate finding of contempt is reviewed for abuse of discretion. *Oral–B Lab. v. Mi–Lor Corp.,* 810 F.2d 20, 23 (2d Cir.1987).

In reviewing the District Court's finding of contempt under the abuse of discretion standard, we bear in mind the circumstances in which this appeal arises. A court's discretion is not unbounded, and the scope of the court's discretion varies according to the issue before it. As to some matters relating to the management of proceedings before the court, such as the introduction of evidence and the regulation of the course and scope of examination of witnesses, a district court's discretion is broad indeed, *see United States v. Wong,* 40 F.3d 1347, 1378 (2d Cir.1994); *Sage Realty v. Insurance Co. of N. Am.,* 34 F.3d 124, 128 (2d Cir.1994); *United States v. Beverly,* 5 F.3d 633, 638 (2d Cir.1993), and we have suggested that where such issues arise the district court's rulings will be affirmed unless they amount to "manifest error." *Sage Realty,* 34 F.3d at 128.

The contempt power is different. First, unlike the general authority to govern the course of a court proceeding, the contempt power may be used to regulate a party's out-of-court behavior, as it was in the present case. *See generally International Union, United Mine Workers v. Bagwell,* —— U.S. ——, ——, 114 S.Ct. 2552, 2560, 129 L.Ed.2d 642 (1994) (distinguishing out-of-court contempts from contempts that occur during the course of a judicial proceeding). Second, even when it is applied to in-court behavior, the contempt power is among the most formidable weapons in the court's arse-

nal, and one with significant potential for harm if it is wielded imprudently. *Project B.A.S.I.C. v. Kemp*, 947 F.2d 11, 16 (1st Cir.1991).

■■ In recognition of these factors, the district court's power to hold a party in contempt—whether civil or criminal—is significantly circumscribed. In a civil contempt proceeding, like the present case, a contempt holding will fall unless the order violated by the contemnor is "clear and unambiguous," the proof of non-compliance is "clear and convincing," and the contemnor was not reasonably diligent in attempting to comply. *Local 580*, 925 F.2d at 594; *New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351 (2d Cir.1989), *cert. denied*, 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990). In light of these restraints on the district court's contempt power, this Court's review of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted.

Bearing these standards in mind, we proceed to address Ciccone's contentions.

### 2. *Knowing and Improper Association*

■ The District Court found that Ciccone violated Paragraph 2(a) of the consent decree by knowingly and improperly associating with organized crime figures and individuals barred from participation in union affairs. On appeal, the government and Ciccone advance widely divergent interpretations of the decree's language. The government reads the prohibition against knowing and improper associations with persons of prohibited status as equivalent to the language in a consent decree involving the Teamsters, which barred the signatories from "knowingly associating" with individuals of prohibited status.

The meaning of "knowingly associating" in the Teamsters decree has been litigated on several occasions and is now well established. *See United States v. International Bhd. of Teamsters (DiGirlamo)*, 19 F.3d 816, 822 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 199, 130 L.Ed.2d 130 (1994); *United States v. International Bhd. of Teamsters (Adelstein)*,

998 F.2d 120, 125 (2d Cir.1993); *United States v. International Bhd. of Teamsters (Cozza)*, 764 F.Supp. 797, 801–02 (S.D.N.Y. 1991), *aff'd*, 956 F.2d 1161 (2d Cir.1992). Under the decisions interpreting the Teamsters consent decree, truly incidental contacts with prohibited individuals, such as encounters at weddings and funerals, are permitted, *Teamsters (Cozza)*, 764 F.Supp. at 813 (decision of independent administrator, affirmed by district court), as are such contacts as are "required in [one's] official capacity." *Teamsters (Adelstein)*, 998 F.2d at 126. Where the contacts are the result of "a 'calculated choice' to associate with persons" of prohibited status, however, the consent decree is violated. *Teamsters (DiGirlamo)*, 19 F.3d at 822. And this is so even if there is no showing that the associations were for an improper purpose. *Id.*

The government concedes that although early drafts of the consent decree in this case contained the language from the Teamsters decree, this language was rejected in later drafts and in the final consent decree. Nevertheless, the government maintains that the inclusion of the word "improperly" in the consent decree did no more than incorporate explicitly the meaning given to "knowingly" by this Court in the Teamsters cases.

Ciccone interprets the decree much more narrowly. In his view, the addition of the word "improperly" to the Teamsters language signified that only those associations with an improper purpose would violate the consent decree. Ciccone concedes that the requirement of a showing of improper purpose does not require a showing of an intent to commit an illegal act; it would be sufficient, in his view, if the government showed that Ciccone associated with prohibited individuals for the purpose and with the intent of exerting influence over the union. Ciccone nevertheless contends that a showing of improper purpose or intent must be made before a violation of the consent decree can be found.

We find both the government's and Ciccone's readings of Paragraph 2(a) unpersuasive. In light of the government's concession that the Teamsters language was considered and rejected in drafting Paragraph 2(a), it is

difficult to credit the government's contention that the decree does no more than state explicitly what all parties understood the Teamsters language to mean. We do not accept Ciccone's interpretation, however, nor do we believe that, because the parties offer competing interpretations, the consent decree is necessarily ambiguous. *See Stroll v. Epstein,* 818 F.Supp. 640, 643 (S.D.N.Y.), *aff'd,* 9 F.3d 1537 (2d Cir.1993). Instead, we conclude that the consent decree gives clear and independent meaning to the word "improperly" without requiring an explicit showing of improper purpose.

■■■ We are required, in interpreting a particular provision of a consent decree, to read that provision in light of the decree as a whole. *Huertas v. East River Hous. Corp.,* 992 F.2d 1263, 1267 (2d Cir.1993). In determining the meaning of "improperly" in Paragraph 2(a), we are drawn in particular to the preamble to the consent decree. There, Ciccone, as a signatory, agreed "that there should be no criminal element or organized crime corruption of any part of the ILA, including Local 1814." Ciccone also agreed that "one of the purposes of this Consent Decree is to ensure that Local 1814 shall be maintained and run democratically, with integrity, solely for the benefit of its members, and without unlawful outside influence." These statements of purpose, contained within the four corners of the consent decree, give clear and unambiguous meaning to Paragraph 2(a): any knowing association with individuals of prohibited status that has either the purpose or effect of promoting a continued organized crime influence on union

affairs, or that has an intimidating or untoward effect on the operation and integrity of the union, is improper and thus prohibited by the consent decree.

If a signatory to this consent decree associates with organized crime figures or other individuals barred from participation in union affairs for the purpose of perpetuating the influence of organized crime over Local 1814, or for the purpose of planning or committing any illegal acts (even those unconnected to union affairs), that association would clearly violate the consent decree. But Paragraph 2(a) does not require such a showing of improper purpose in every instance. For example, were Ciccone, a well-known former leader of Local 1814, to associate openly with organized crime figures in a location commonly frequented by union officials or members, a court could reasonably conclude that such associations had an untoward or intimidating effect on the union even absent a showing that Ciccone intended by those associations to perpetuate the influence of organized crime over the union.

Paragraph 2(a), then, requires the court initially to consider the status of the signatory individual, the status of the persons with whom the signatory associated, and the circumstances of the association.[1] Only where an improper effect on the union's autonomy, operations, or integrity cannot be inferred from these factors must the court consider whether the associations had an improper purpose in order to find a violation of the decree.[2]

---

1. The burden of proving prohibited status, either affiliation with organized crime or a bar from participation in union affairs, of course rests with the government. *See Badgley v. Santacroce,* 853 F.2d 50, 54 (2d Cir.1988) (burden of proof rests with party moving for contempt); *In re Kitchen,* 706 F.2d 1266, 1273 (2d Cir.1983) (same).

2. It bears mentioning that Ciccone is not the sole signatory defendant to the consent decree. Not only did other individual defendants sign, but Local 1814 agreed to the consent decree on behalf of its members. As a result, the ban on knowing and improper associations with organized crime figures and individuals barred from participation in union affairs extends not merely to Ciccone and the other individual signatory

defendants, but also to "all current and future officers, agents, representatives, employees, and members of Local 1814." Consent Decree ¶ 2. There may be instances in which it is difficult to conclude that the consent decree has been violated in the absence of a showing of improper purpose. For example, this may be so when two individuals barred from participation in union affairs knowingly associate in a setting entirely removed from the Waterfront milieu. When an active union officer, agent, representative, employee, or member knowingly associates with such individuals of prohibited status, however, the danger of improper influence on the union is readily apparent, and the conclusion of impropriety might well be drawn even in the absence of an explicit showing of an improper purpose.

In discussing the purpose of the consent decree, we recognize the Supreme Court's statement that "the *decree* itself cannot be said to have a purpose; rather the *parties* have purposes, generally opposed to each other, and the resultant decree embodies as much of those opposing purposes as the respective parties have the bargaining power and skill to achieve." *United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). The *Armour* Court emphasized that "the scope of a consent decree must be discerned within its four corners," and not by reference to what one or the other of the parties hoped to achieve in the decree, or in the underlying litigation. *Id.* at 682, 91 S.Ct. at 1757. Where a statement of purpose is contained in the decree itself, however, as the product of arm's-length negotiations, and that purpose may be discerned without reference to the extrinsic aims of the parties, *Armour* cannot be read to prohibit consideration of that purpose. We therefore see no difficulty in interpreting the decree in light of its agreed-upon purpose to protect the integrity and independence of the union.

The District Court did look to the purpose of the consent decree to give meaning to the word "improperly." It appears, however,

that the Court concluded that any systematic contacts between Ciccone and alleged organized crime figures would be improper under the consent decree, regardless of the circumstances. We think that such an interpretation exceeds the bounds of the consent decree, and is in effect indistinguishable from the interpretation given to the language of the Teamsters decrees. The mere fact of knowing association with individuals of prohibited status is not enough; in the absence of a showing of explicit impropriety, there must also be grounds, based on the circumstances of the particular contacts in question, for concluding that those contacts help to perpetuate organized crime's control over the union or impinge on the integrity and independence of the union. Accordingly, we vacate the District Court's finding that Ciccone knowingly and improperly associated with individuals of prohibited status.[3]

Because the enforcement order is based on the Court's initial finding that the consent decree was violated, we must also vacate those portions of the enforcement order that depend on the finding of knowing and improper association: Paragraph 1, which lists a large number of individuals with whom Ciccone is not to associate, knowingly and improperly;[4] Paragraph 2, which prohibits

**3.** Ciccone complains that the District Court accepted, without a hearing, the government's allegations that particular individuals with whom he associated were affiliated with organized crime. It is true that the District Court did not hold a hearing, although we note that Ciccone made no offer of proof to counter the government's evidence—indeed, the only challenge that Ciccone made to the government's evidence was a general statement by counsel during oral argument. Nevertheless, even if the District Court's conclusions regarding the organized crime status of particular individuals could be challenged, at least two of the individuals with whom Ciccone associated were without doubt on the prohibited list, because they were barred from participation in union affairs. Thus, leaving aside the contacts with alleged organized crime figures, a violation of the consent decree could be found if Ciccone's contacts with these individuals, who had been ordered not to take part in union affairs, were knowing and improper under the reading we have given the consent decree.

**4.** Because we vacate Paragraph 1 of the enforcement order, we need not resolve Ciccone's contention that the order improperly infringes his First Amendment associational rights. Ciccone does not appear to contest the principle that an

individual may waive constitutional rights in a consent decree, provided that the waiver is voluntary, knowing, and intelligent. *See D.H. Overmyer & Co. v. Frick Co.*, 405 U.S. 174, 187, 92 S.Ct. 775, 783, 31 L.Ed.2d 124 (1972); *Davies v. Grossmont Union High Sch. Dist.*, 930 F.2d 1390, 1394–95 (9th Cir.), *cert. denied*, 501 U.S. 1252, 111 S.Ct. 2892, 115 L.Ed.2d 1057 (1991). Moreover, he seems to concede that his signing of the consent decree was voluntary, knowing, and intelligent. Ciccone's argument appears to be instead that the District Court's enforcement order violates his First Amendment rights by forbidding him to associate with named individuals whose prohibited status has not been proven. But on remand, should the Court find that Ciccone did violate the consent decree, it may well grant him a hearing and allow him to offer evidence that any particular individual identified by the government was not in fact affiliated with organized crime or otherwise of prohibited status. If the Court did so, before reissuing a list of prohibited individuals, the force of Ciccone's First Amendment claims would be significantly reduced, if not negated. Accordingly, we do not today decide whether, in the absence of a hearing, Ciccone's First Amendment objections have merit.

Ciccone from associating with any member, officer, or employee of the ILA or its affiliates;[5] and Paragraph 3, which bars Ciccone from visiting a number of specific locations associated either with organized crime or with the union.

### 3. *The Window Period Pension*

 The District Court concluded, on alternate grounds, that Ciccone was ineligible for the window period pension for which he applied. First, the Court stated that Paragraph 9(b) of the consent decree left Ciccone eligible only for vested pension or severance benefits. Because the window period pension concededly was not a vested benefit, the Court reasoned, Ciccone was ineligible. Second, the Court noted that the benefit that Ciccone sought required Ciccone to obtain a discretionary waiver from the pension's eligibility requirements, and thus created an opportunity for Ciccone to wield his influence over individuals affiliated with the ILA. This, in the Court's view, was precisely the result that the consent decree was designed to prevent.

Ciccone objects to the Court's statement that Paragraph 9(b) leaves him eligible only for vested pension and severance benefits. He points to the preceding sentence of Paragraph 9(b), which states: "Nothing in this subparagraph ... shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo

Agreement. ..." He further relies on a prior interpretation of Paragraph 9(b) by Judge Sand (to whom this case was assigned at the time). *See United States v. Local 1804–1, Int'l Longshoremen's Ass'n,* 90 Civ. 0963, 1992 WL 77637 (S.D.N.Y. Mar. 24, 1992). In that proceeding, Ciccone had argued that the provision that allowed him to remain a union member for the purpose of obtaining eligibility for benefits permitted him to hold himself out as available for work to the extent that doing so was necessary to obtain benefits. Judge Sand rejected Ciccone's position, noting that the consent decree expressly barred Ciccone from employment by any entity doing business on the Waterfront. Ciccone, Judge Sand concluded, was only "eligible to receive such benefits as are available to a member of Local 1814 by virtue of his *past* membership and employment." *Id.,* slip op. at 4, 1992 WL 77637 at *2. Ciccone argues that the window period pension falls within the category of benefits for which Judge Sand said he was eligible.

The District Court did not cite Judge Sand's opinion, and instead relied solely on the text of Paragraph 9(b) for its conclusion that Ciccone was only permitted to receive vested benefits. We agree with Ciccone that, to this extent, the District Court's interpretation of Paragraph 9(b) is problematic. Paragraph 9(b) does permit Ciccone to remain a union member for the purpose of obtaining eligibility for benefits. Since, by definition, eligibility is immaterial where benefits are

---

**5.** We find Paragraph 2 of the enforcement order troubling for another reason: the paragraph imposes a restriction on Ciccone that is not contained in the consent decree. It is true that Paragraph 2(a) of the consent decree prohibits members, officers, and employees of the ILA and its affiliates from knowingly and improperly associating with Ciccone, given his status as an individual prohibited by the consent decree from participating in union affairs. To the extent that the government wishes to enforce this provision, however, it must do so by proceeding against individual union members, officers, or employees. Nothing in the Paragraph 2(a) of the consent decree may be interpreted to give the government the right to move for contempt sanctions against Ciccone for merely associating with union members, officers, or employees.

Paragraph 9(b) of the consent decree offers some possible support for the prohibition contained in Paragraph 2 of the enforcement order.

Paragraph 9(b) bars Ciccone "from any employment or other participation in the affairs of any entity doing business on the Waterfront," which we read to include the ILA and Local 1814. This provision could support an order that prohibited Ciccone from associating or communicating with individuals having discretionary authority over union affairs. The enforcement order, however, goes further: it bars Ciccone from associating with union members generally. In the absence of a District Court finding that particular associations with lower-level union members amounted to Ciccone involving himself in the union's business, this order is too far removed from the goal of ensuring that Ciccone does not participate in union business to be supported by Paragraph 9(b). Were we not already vacating Paragraph 2 of the enforcement order, we would vacate it on the grounds that—without more facts—it oversteps the bounds of the original consent decree.

vested and nonforfeitable, to read Paragraph 9(b) as permitting Ciccone to receive only vested benefits would effectively render a portion of the paragraph superfluous. It is easy to imagine, moreover, why that part of the paragraph was included. Thus, for example, if Local 1814 made a new medical benefit available to its members, solely by virtue of their membership in the union, Ciccone would appear to be eligible for that benefit under Paragraph 9(b), even though the benefit was not vested.

We need not define the precise types of benefits for which Ciccone might be eligible, however, because whatever benefits Paragraph 9(b) might allow Ciccone to obtain, it does not permit him to seek the window period pension at issue here. As we have previously noted, Paragraph 9(b) bars Ciccone from participating in the affairs of any entity doing business on the Waterfront, including Local 1814. The provision that permits Ciccone to remain a union member *solely* for the purpose of obtaining eligibility for benefits in no way diminishes the prohibition against participation in union affairs. It only allows Ciccone to maintain his union membership in a totally passive way. And it cannot be read to permit Ciccone to attempt to wield his influence within the union to obtain for himself a discretionary benefit that is not available to union members generally.

Under Paragraph 9(b), Ciccone may obtain any benefits available to union members solely by virtue of their union membership and past employment. He may also obtain benefits that have become available through the exercise of a general discretion that does not involve him individually. There may, for example, be instances in which discretion may be exercised by benefit plan trustees in ways that do not involve a special determination of eligibility for one individual, but rather involve general interpretations of a benefit plan document. If, in such circumstances, the plan trustees choose to interpret the document so as to advantage a group of members, including (without a further exercise of discretion) Ciccone, then Ciccone

would be eligible to receive the benefit.[6] In these circumstances, Ciccone's receipt of benefits is entirely passive. And the mere administrative act of filing an application cannot be considered participation in union affairs, because the opportunity for improper influence over the union does not arise.

The window period pension does not fall within this class of benefits, however. Rather, in applying for the window period pension, Ciccone sought an individualized discretionary waiver from the pension fund in order to obtain a benefit the eligibility requirements for which he plainly did not meet. By doing so, Ciccone did more than maintain his union membership for the purpose of obtaining eligibility for benefits; he inevitably attempted to influence the decisionmaking of an entity doing business on the Waterfront. This conduct is prohibited by the consent decree. We therefore agree with the District Court that Ciccone's application for the window period pension violates Paragraph 9(b).

Ciccone further contends that even if the consent decree is interpreted so as to render him ineligible for the window period pension, the District Court erred in imposing contempt sanctions on him for conduct that rested on a plausible interpretation of the consent decree, and for which Ciccone sought the advice of counsel before proceeding. We need not address the merits of this argument, because we conclude that the District Court did not sanction Ciccone for his actions with respect to the pension application. The only portion of the Court's enforcement order that specifically addresses Ciccone's pension application does no more than require him to withdraw the application, forswear any window period pension benefits, and decline to participate in any arbitration involving his application. This portion of the order, in short, only requires Ciccone to adhere to the consent decree as interpreted, properly, by the District Court. The subsequent provision, which says that "[a]ny violation of this Order shall subject Ciccone to escalating fines and/or imprisonment," states the obvi-

---

**6.** Paragraph 9(b), however, would obviously still bar Ciccone from seeking in any way to influence the plan trustees to make such an interpretation.

ous, as the Court would have the authority to sanction Ciccone for violations of the order even in the absence of such an express warning.

We therefore affirm the part of the Court's April 29 order that deals with Ciccone's pension application, and Paragraphs 4 and 5 of the Court's enforcement order of May 24.

## CONCLUSION

For the foregoing reasons, we vacate the portion of the District Court's order of April 29, 1994, that found that Ciccone had violated the consent decree by knowingly and improperly associating with individuals of prohibited status. We also vacate Paragraphs 1, 2, and 3 of the Court's enforcement order of May 24, 1994. We affirm the finding that Ciccone violated the consent decree by pursuing his application for a window period pension, and affirm Paragraphs 4 and 5 of the enforcement order. We remand the matter for further proceedings consistent with this opinion.

JON O. NEWMAN, Chief Judge, dissenting in part:

Though seamen are the wards of the admiralty court and therefore entitled to sympathetic consideration, it is not surprising that former officials of the International Longshoremen's Association ("ILA"), now under court regulation because of suspected organized crime activities, enjoy no similar solicitude. Nevertheless, even former ILA officials who have settled RICO cases by accepting the terms of a far-reaching consent decree are entitled to have the usual rules applied when they are accused of contempt for violating such a decree.

In this case, I agree that Anthony Ciccone may be validly found in civil contempt for violating the prohibition against "knowingly and improperly associating" with organized crime figures, if, on remand, findings are made that satisfy the majority's careful construction of the term "knowing[ ] and improper[ ] associa[tion]." However, I respectfully dissent from the further ruling that Ciccone was properly found in contempt because, like twelve other ILA members, he applied for a so-called "window" pension ben-

efit after the applicable filing deadline. The decree does not explicitly bar Ciccone from applying for this or any other pension benefit, and we should not stretch either the decree or the law of contempt to say, as the majority does, that Ciccone's attempt, through his counsel, to seek a favorable exercise of the pension authority's discretion to waive the filing deadline and then to challenge the adverse decision in arbitration is punishable as a contempt.

The relevant language of the decree bars Ciccone from ILA membership and from "participation in the affairs" of "any entity doing business on the Waterfront," Decree, ¶ 9(b), and the ILA and its affiliates are such entities. However, the drafters sought to preclude the possibility that the broad prohibitions against membership and "participation" could be overzealously applied to the mere act of seeking benefits arising from past or current membership. The decree therefore provides:

> Nothing in this subparagraph, however, shall preclude Ciccone from remaining a member of Local 1814 solely for the purpose of obtaining eligibility for benefits pursuant to the General Cargo Agreement, subject to the authority of the Monitor herein. Nothing in this provision shall impair Ciccone's entitlement to any welfare or vested pension or severance benefits.

The "window" pension benefit for which Ciccone had the temerity to apply is a special enhanced retirement benefit offered by the New York Shipping Association, Inc. to employees over 55 who withdrew from the industry during either of two time periods, the latest of which ended on January 31, 1991. Ciccone applied for this benefit on April 8, 1992. His lawyer argued to the pension authorities that the lateness of the application should be waived because Ciccone was forced out of the Union by the Government's action in bringing the RICO suit and because he had received a ruling from Judge Sand that, though he was not entitled to work in order to obtain benefits, he was entitled "to receive such benefits as are available to a member of Local 1814 by virtue of his *past* membership and employment." *United States v. Local*

*1804–1, Int'l Longshoremen's Ass'n,* 90 Civ. 0963, 1992 WL 77637 (S.D.N.Y. March 24, 1992) (emphasis in original).

In this contempt proceeding, Judge Martin found Ciccone in contempt for seeking the "window" pension benefit because he is not eligible for it. In Judge Martin's view, the decree assures entitlement only to "vested pension or severance benefits," and the "window" pension benefit is not vested. In this Court, the majority declines to adopt Judge Martin's view that Ciccone remains eligible only for vested benefits and instead rules him potentially eligible for other, unspecified benefits. Nevertheless, the majority upholds the contempt citation, based on Ciccone's application for the "window" pension benefit, on the theory that seeking a favorable exercise of discretion with regard to the benefit is within the category of conduct prohibited by the ban on "participation" in ILA affairs.

The issue for us is not whether Ciccone should receive a "window" pension benefit. Nor is it whether he has shown good cause for waiver of the filing deadline. Those are issues appropriate for decision by the pension fund administrators, and by an arbitration panel, in the event that an adverse ruling is challenged. Our task is to determine whether the decree's ban on "participation" in ILA affairs remains that "clear and unambiguous" provision necessary as a predicate for a contempt citation, *see Powell v. Ward,* 643 F.2d 924, 931 (2d Cir.1981), when it is applied to the act of seeking a favorable exercise of discretion to waive the filing deadline for a pension benefit.

Even if Ciccone were the only person who had ever asked for the favorable exercise of discretion in regard to an ILA pension benefit, I could not agree that such a request is a contempt in violation of a general prohibition on "participation" in union affairs. But when the record shows that twelve other union members also sought waivers of the cut-off date and two were granted waivers, Record Item 832, it is trifling with the rigor of contempt law to make his application the basis of a contempt. The prohibition on "participation" stands as a guard against any effort by Ciccone to exert influence in the general affairs of the ILA. It does not bar

him from hiring a lawyer, applying for discretionary waiver of a filing deadline to obtain a pension benefit, and then seeking to challenge the rejection of his waiver request in arbitration.

I respectfully dissent from the pension aspect of the Court's judgment.