JENNIFER WALKER ELROD, Circuit Judge,
dissenting:
Because I would hold that the district court did not abuse its discretion in holding Interior in contempt, I respectfully dissent. While the majority views Interi- or’s acts in isolation, the totality of' the circumstances supports the able district court’s decision.
I.
The Gulf of Mexico is one of the largest oil and gas basins' in the world. Its wells accounted for almost one-third of the nation’s domestic oil production in 2009. The Gulfs Outer Continental Shelf (“OCS”) has thousands of active leases, most in the deepwater, and is a vital national resource that Congress has determined “should be made available for expeditious and orderly development, subject to environmental safeguards, in a manner which is consistent with the maintenance of competition and other national needs.” 43 U.S.C. § 1332(3).
Deepwater drilling, exploration, and production operations in the Gulf of Mexico keep thousands of Americans at work. An intricate network of companies cooperate to provide the technology, assets, and human capital necessary to keep the industry in motion. Cf. Interior’s Safety’Report at 4 (“The OCS oil and gas industry provides relatively high-paying jobs in drilling and production activities, as well as employment in supporting industries. Offshore operations provide direct employment estimated at 150,000 jobs.”). Take, for example, Hornbeck. It contracts with oil and gas production companies to provide supply vessels that are specifically designed to assist in the deepwater drilling process. In 2010, it employed about 1300 people and maintained a working relationship with almost 2000 other vendors and service providers. Hornbeck is but one of thousands of companies whose viability depends on deepwater drilling in the Gulf.
*820 The Deepwater Horizon tragedy rocked not only the business of deepwater drilling in the Gulf, but also the region’s entire economic and ecological system. Its devastating consequences reverberated across the nation. In its wake, the President ordered Secretary Salazar to investigate the Deepwater Horizon incident and recommend, if necessary, additional safety requirements for OCS exploration and production efforts. Secretary Salazar halted consideration of all new applications for drilling permits in the Gulf while he complied with the President’s order.
During the course of Interior’s investigation, the Mineral Management Service (now known as the Bureau of Ocean Energy Management) inspected twenty-nine of the thirty-three permitted wells that were being drilled in the Gulfs deepwater. Of the twenty-nine inspected wells, twenty-seven were fully compliant with all regulations. Only two had minor violations, which were quickly corrected.
Interior’s research culminated in the Safety Report, issued on May 27, 2010, about five weeks after the Deepwater Horizon explosion. The body of the Safety Report included numerous proposals to improve OCS drilling safety, such as equipment enhancements, testing requirements, and certification procedures. The report’s executive summary, however, included an additional recommendation: a six-month halt to all drilling in the Gulf of Mexico. Although the Safety Report stated that all of its recommendations were peer-reviewed by seven experts identified by the National Academy of Engineering, five of those experts, plus three consulting experts, later stated that the report misrepresented their position. According to these experts, the moratorium recommendation “was added after the final review,” and, therefore, not a part of their analysis. An investigation by the Interior’s Office of Inspector General later revealed that a White House edit “led to the implication that the moratorium recommendation had been peer-reviewed by the experts.” One day after it published the Safety Report, Interior issued a memorandum effectuating the six-month moratorium (the “May Moratorium”).
Hornbeck, along with numerous other companies in the deepwater drilling industry, quickly filed suit to enjoin Interior from enforcing the May Moratorium. Among other things, they argued that the May Moratorium violated the APA because it was arbitrary and capricious. The district court held a hearing on Plaintiffs’ motion, at which it rigorously questioned counsel for both parties for over two hours. According to the district court, the government responded to one of its questions with an answer that was “wholly at odds with the story of the misleading text change by a White House official, a story the government does not now dispute.” One day after the hearing, the district court granted Plaintiffs’ motion, carefully detailing the basis for its decision in a twenty-two page opinion. The district court then entered an order that “immediately prohibited” Interior from enforcing the moratorium “as applied to all drilling on the OCS in water at depths greater than 500 feet.” The order further specified that Interior was to file, within twenty-one days, a report “setting forth in detail the manner and form in which [Interior] ha[d] complied with the terms of [the] Preliminary Injunction.”
Immediately following the court’s entry of the preliminary injunction, Interior took steps to ensure that the intended effect of the May Moratorium — that no one drill in the Gulf — remained intact. For example:
• Within hours, Secretary Salazar publicly announced that the May Moratorium “was and is the right deci *821 sion” and promised to “issue a new order in the coming days that eliminates any doubt that a moratorium is needed, appropriate, and within our authorities.”[1]
• The next day, Secretary Salazar attended a Senate subcommittee hearing, where he again declared that he would issue an identical moratorium in short order.
• At the Senate hearing, Secretary Salazar twice referred to the moratorium as “in place.” First, after noting his disagreement with the district court’s order, Secretary Salazar stressed, “it is important that this ... moratorium stay in place until we can assure that deepwater drilling can be done in a safe way.” Then, he responded to a question concerning the May Moratorium’s effect on drilling in Alaska specifically stating: “You know, the moratorium that is in place does, in fact, apply to Alaska wells and to the exploration of wells that Shell had proposed to put into place.”
• Interior then hosted a meeting with numerous oil and gas representatives. Although it acknowledged the injunction, it again emphasized that it intended to issue a second moratorium. An industry participant averred that this signaled “that the cost and expense of resuming drilling should not be undertaken by [the] industry because the second moratohum would prevent that activity from continuing once it was issued.”
• Interior appealed the district court’s order and moved to stay the injunction pending appeal. In its motion, Interior proclaimed that “reducing deepwater drilling risks is a national priority; the Secretary will pursue all avenues for addressing risky operations, and will take new and immediately effective action as necessary.” [2]
• Further, Interior decided to notify thousands fewer entities of the preliminary injunction order than it had of the May Moratorium. When it issued the May Moratorium, Interior sent written notice to all 4500 active leases in the Gulfs deepwater. By contrast, its notice regarding the preliminary injunction went to only the thirty-three wells that were being drilled at the time of the Deep-water Horizon incident.
Ultimately, these actions had the same effect as the May Moratorium: no one resumed drilling.
As promised, Interior issued a new moratorium (the “July Moratorium”) in place of the May Moratorium. As the majority recognizes, the July Moratorium was “without doubt” the same in “scope and substance” as the May Moratorium. They were mirror images of one another, covering the same rigs and the same deepwater drilling for the same period. Indeed, as the district court explained, “nearly every statement in the July 12 decision memo *822 randum is anticipated by documents in the [May Safety Report] record, or by documents that were otherwise available to the Secretary” at the time he issued the May Moratorium. Interior issued the July Moratorium without seeking remand to reopen its administrative proceedings, despite the fact that its expedited appeal of the district court’s preliminary injunction order on the May Moratorium was pending before this court.
In motions before both the district court and this court, Interior sought to avoid a final decision on the merits regarding whether the May Moratorium was arbitrary and capricious. It argued that its rescission of the May Moratorium rendered the issue moot. After a series of proceedings, including a remand to the district court, we declined to address an injunction that was “legally and practically dead,” and denied Interior’s merits appeal as moot. In light of that decision, the district court declined to further enforce the preliminary injunction. Interior lifted the July Moratorium on October 12, 2010, allowing drilling operations to resume and essentially mooting Plaintiffs’ suit.
Plaintiffs moved for civil contempt in the district court, seeking their attorneys’ fees in the suit. They argued that Interior’s actions following the entry of the court’s preliminary injunction reflected a “calculated plan to interfere with enforcement of a remedy obtained by Plaintiffs and to insulate the moratorium decision from judicial review.” By this time, the district court had reviewed thousands of pages, held numerous hearings, thoughtfully considered and decided multiple motions, and confronted the very issues in play in the contempt order. In short, the district court knew this case inside and out. Viewing the totality of the circumstances, the district court concluded that Interior’s actions amounted to a “determined disregard” of the preliminary injunction order and found Interior in contempt.
II.
“Courts have, and must have, the inherent authority to enforce their judicial orders and decrees in cases of civil contempt. Discretion, including the discretion to award attorneys’ fees, must be left to a court in the enforcement of its decrees.”[3] *823 Cook v. Ochsner Found. Hosp., 559 F.2d 270, 272 (5th Cir.1977) (citing United States v. United Mine Workers, 330 U.S. 258, 303-304, 67 S.Ct. 677, 91 L.Ed. 884 (1947)); see Spallone v. United States, 493 U.S. 265, 276, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (expressing “the axiom that courts have inherent power to enforce compliance with their lawful orders through civil contempt” (internal quotation marks omitted)); Positive Software Solutions, Inc. v. New Century Mortg. Corp., 619 F.3d 458, 460 (5th Cir.2010) (recognizing district courts’ inherent authority to impose sanctions) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991)). “The theory for allowing attorneys’ fees for civil contempt is that civil contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance.” Cook, 559 F.2d at 272. A district court’s contempt power extends to the actions of government officials with equal force. See Gilbert v. Johnson, 490 F.2d 827, 830 n. 6 (5th Cir.1974) (affirming the district court’s “right to apply the sanctions of contempt even though Government officials are involved”).
A court may exercise its contempt power over actions that constitute “disobedience to the orders of the Judiciary.” Chambers, 501 U.S. at 44, 111 S.Ct. 2123. While the relevant order must be specific and definite, the district court “need not anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated.” Am. Airlines, 228 F.3d at 578 (citing N. Alamo Water Supply Corp. v. City of San Juan, 90 F.3d 910, 917 (5th Cir.1996)). In other words, an order simply must be “framed so that those enjoined will know what conduct the court has prohibited.” Id. (quoting Meyer v. Brown & Root Const. Co., 661 F.2d 369, 373 (5th Cir.1981)).
In analyzing a district court’s contempt finding, it is essential to view the facts in their totality. This court should remain cognizant that the imposition or denial of sanctions is necessarily “fact-intensive.” Test Masters Educ. Servs. Inc. v. Singh, 428 F.3d 559, 582 (5th Cir.2005) (quoting Thomas v. Capital Sec. Serv., Inc., 836 F.2d 866, 873 (5th Cir.1988)). Factual findings are subject to the deferential “clear error” standard on appeal. Whitcraft, 570 F.3d at 271; see Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (noting that clear error does not exist if a factual finding is “plausible in light of the record viewed in its entirety,” even if we would have weighed the evidence differently (emphasis added)). The district court judge, not this court, is in the “best position to review the factual circumstances and render an informed judgment as he is intimately involved with the case, the litigants, an the attorneys on a daily basis.” Test Masters, 428 F.3d at 582. A “second-hand” review of the facts adds “no advantage,” as the “district court will have a better grasp of what is acceptable trial-level practice among litigating members of the bar.” Id.
The majority opinion weakens the contempt power of federal district courts by making unreasonably restrictive fact findings of its own to reach a narrow and unworkably technical result. It stresses that the preliminary injunction order did not expressly prohibit Interior from harboring an intent to reinstate an identical moratorium, or from stating that intent in the public forum.. Likewise, the preliminary injunction order did not expressly require Interior “to seek permission for a remand before developing additional rules on offshore drilling in the Gulf.” In es *824 sence, the majority opinion suggests that a litigant can undermine and avoid a district court’s order, provided that it does not, as a very technical matter, engage in activity that the order expressly prohibits.
This court’s precedent is not so cramped, however. A district court order need not anticipate every creative or strategic tactic a litigant may take to evade it. See N. Alamo, 90 F.3d at 917 (“Although this order does not choreograph every step, leap, turn, and bow of the transition ballet, it specifies the end results expected and allows the parties the flexibility to accomplish those results.”); see also Am. Airlines, 228 F.3d at 576. American Airlines is instructive on this point. There, the district court issued a temporary restraining order mandating that union officials call off a “sick-out” by the union’s pilot members. Id. While the union officials engaged in a number of technical steps to comply with the court order, their initial communication was “so lacking in authoritative forcefulness that [it] either [was] not heard at all ... or [was] discounted as being merely stage lines parroted for the benefit of some later judicial review.” Id. at 921 (quoting United States Steel Corp. v. United Mine Workers of Am., Dist. 20, 598 F.2d 363 (5th Cir.1979)). The district court held certain union defendants in contempt based on this “wink- and-a-nod” approach. Id. at 928-29. We affirmed. Am. Airlines, 228 F.3d at 576. Other cases decided by courts in this circuit illustrate the same general approach. See S.E.C. v. Reynolds, No. 3:08-CV-438-B, 2011 WL 903395, at *1 (N.D.Tex. Mar. 16, 2011) (holding a defendant in contempt for violating the terms of an asset freeze order after he failed to pay taxes and assessments on a condominium, even though the order did not expressly require the defendant to pay taxes or assessments); Greater New Orleans Fair Hous. Action Ctr. v. St. Bernard Parish, 641 F.Supp.2d 563, 565 (E.D.La.2009) (concluding that a Parish Council’s moratorium on the construction of multi-family housing violated the terms of a consent order, even though that order did not explicitly prohibit the Council from imposing the moratorium).
Here, the purpose of the district court’s order was clear: Interior could not enforce the May Moratorium on drilling. By, among other things, referring to the May Moratorium as “in place” without simultaneously indicating that drilling could proceed pursuant to the court’s injunction, emphasizing its immediate intent to issue a new, identical moratorium, and notifying only the thirty-three wells that were being drilled at the time of the Deepwater Horizon incident, Interior ensured that the May Moratorium remained de facto in place. Considering these circumstances as a whole, the district court concluded that “each step the government took following the Court’s imposition of a preliminary injunction showcase[d] its defiance” of the court’s order.
Viewing the facts and the district court’s preliminary injunction in their totality, I cannot say that the district court abused its discretion in finding Interior in contempt. For that reason, I would affirm.
III.
In reaching its conclusion, the majority opinion stresses that this was a case of national importance — a fact that, in the majority opinion’s view, “weakens, not strengthens the propriety of [a] court’s contempt finding.” I find this troubling.
Our Founding Fathers stressed'the necessity of protecting the independence of the Judiciary, especially in light of its unique vulnerability to attack by the other branches of government. See The Federalist No. 78 at 227 (Alexander Hamilton) *825 (Roy P. Fairfield ed., 1961) (“[T]he judiciary is the weakest of the three departments of power ... all possible care is requisite to enable [the Judiciary] to defend itself.”); see also N. Pipeline Const. Co. v. Marathon Pipe Line Co., 458 U.S. 50, 58, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (“The Federal Judiciary was ... designed by the Framers to stand independent of the Executive and Legislature — to maintain the checks and balances of the constitutional structure.”).
The Judiciary’s inherent contempt power is essential to preserve judicial independence and to ensure that judicial decrees are not impotent. In describing its nature and importance, the Supreme Court has stressed that “[t]he power to punish for contempt ... is essential to ... the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice.” Ex parte Robinson, 86 U.S. 505, 510, 19 Wall. 505, 22 L.Ed. 205 (1873); see Gompers v. Buck’s Stove & Range Co., 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797 (1911) (“[T]he [contempt] power has been uniformly held to be necessary ... to enable [the Judiciary] to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of citizens.”); see also In re Bradley, 588 F.3d 254, 265 (5th Cir.2009) (quoting Gompers, 221 U.S. at 450, 31 S.Ct. 492). Leaving the Judiciary powerless to enforce its own orders incontestably renders it a subordinate branch of government.
As the majority opinion states, the “controversial policy decisions” at issue here were “made at the highest levels of government.” But that does not insulate those decisions from judicial review. The district court determined that the Interi- or’s actions amounted to a “determined disregard” of its preliminary injunction order. The court’s power to enforce its orders must remain intact, even in the midst of the most critical emergencies of the state. Simply put, the Judiciary may be the least dangerous branch, but it is not entirely toothless.
For these reasons, I respectfully dissent.

. The Secretary's comments came on the heels of the district court’s holding that the May Moratorium was so lacking in scientific support that it was likely arbitrary and capricious. The short time that elapsed between entry of the district court's order and these comments is, therefore, an important part of the overall contempt equation. Regardless of whether Interior had authority to issue a new moratorium, the district court recognized that the immediacy of the Secretary's public statements showed a “determination to issue a new moratorium even before the consideration of any new information.”

. This court denied Interior's motion to stay, but ordered expedited briefing on its appeal.

. On appeal, this Court reviews a district court’s finding of contempt for abuse of discretion. Whitcraft v. Brown, 570 F.3d 268, 271 (5th Cir.2009) (citing United States v. City of Jackson, 359 F.3d 727, 731 (5th Cir.2004)). Relying on the Second Circuit's opinion in United States v. Local 1804-1, the majority opinion suggests that a “more rigorous” abuse-of-discretion standard applies to the district court’s civil contempt finding and award of compensatory sanctions. 44 F.3d 1091, 1095-96 (2d Cir.1995) (stating the proposition that appellate review of a contempt order is “more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted.”). If the majority opinion simply means that a district court's discretion is subject to certain limitations — such as the clear and convincing evidentiary standard — in the civil contempt context, then I agree. See, e.g., Spallone v. United States, 493 U.S. 265, 110 S.Ct. 625, 107 L.Ed.2d 644 (1990) (noting that the use of the contempt power “places an additional limitation on a district court's discretion” because "in selecting contempt sanctions, a court is obliged to use the 'least possible power adequate to the end proposed’ ” (internal quotation and citation omitted)); Travelhost, Inc. v. Blandford, 68 F.3d 958, 961 (5th Cir.1995) (noting that a court must find contempt by clear and convincing evidence). If, however, the majority has applied a heightened standard of review on appeal (essentially abuse-of-discretion-plus), then I am aware of no support in our precedent for that approach. To the contrary, we have consistently applied an ordinary abuse-of-discretion standard in the civil contempt context. See, e.g., Whitcraft, 570 F.3d at 271; Jackson, 359 F.3d at 731; Am. Airlines, Inc. v. Allied Pilots Ass'n, 228 F.3d 574, 578 (5th Cir.2000). As such, we are not at liberty to deviate from the ordinary abuse-of-discretion standard.