EQUAL EMPLOYMENT OPPORTUNITY COMMISSION and City of New York, Plaintiffs–Appellees,

v.

LOCAL 638, etc., Defendants,

Local 28, Sheet Metal and Air Conditioning Contractors' Association of New York City, Inc., and the Sheet Metal and Air Conditioning Contractors' National Association of Long island, Inc., (collectively the "Contractors' Associations"); Local Union No. 28, and Sheet Metal Workers' International; Defendants–Appellants.

Nos. 401, 402, 718, Dockets 95–6047, 95–6049, 95–6135.

United States Court of Appeals, Second Circuit.

Argued Sept. 26, 1995.

Decided April 10, 1996.

See also, 565 F.2d 31 and prior cases; 753 F.2d 1172; 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344.

Karen M. Moran, Washington, DC (C. Gregory Stewart, Gwendolyn Young Reams, Vincent J. Blackwood, Washington, DC), for Plaintiff–Appellee Equal Employment Opportunity Commission.

Elizabeth S. Natrella, New York, N.Y. (Paul A. Crotty, Corporation Counsel of the City of New York, Leonard J. Koerner, Pamela Seider Dolgow, Hilary B. Klein, Paul E. Kazanoff, Dennis C. Vacco, Attorney General of the State of New York, Lula M. Anderson, Angie I. Martell, New York, NY), for Plaintiffs–Appellees City of New York and New York State Division of Human Rights.

Charles J. Cooper, Washington, DC (Robert J. Cynkar, David H. Thompson, Shaw, Pittman, Potts & Trowbridge, Washington, DC, Jamie K. Nicastri, Edmund P. D'Elia, P.C., New York, NY), for Defendant–Appellant Local 28 of the Sheet Metal Workers International Association.

Martin R. Gold, New York, N.Y. (Robert P. Mulvey, Gillian M. Lusins, Gold, Farrell & Marks, New York, NY, William Rothberg, Brooklyn, NY, Judy Sandler, Huntington Station, NY), for Defendants–Appellants Sheet Metal and Air Conditioning Contractors' Association of New York City, Inc. and Sheet Metal and Air Conditioning Contractors' National Association of Long Island, Inc.

(Juan A. Figueroa, Kenneth Kimmerling, New York, NY) for Amici Curiae Puerto Rican Legal Defense and Education Fund, Inc. and NAACP Legal Defense and Educational Fund, Inc.

(David R. Hols, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN) for Amicus Curiae Sheet Metal and Air Conditioning Contractors' National Association, Inc.

Before: LUMBARD, WALKER, and CALABRESI, Circuit Judges.

WALKER, Circuit Judge:

As this case approaches its twenty-fifth birthday, it is before us for a fourth time. In July 1993, Plaintiff-appellee City of New York (the "City") moved for contempt or a modification of the district court's prior orders. In an Amended and Corrected Opinion, dated March 6, 1995, the United States District Court for the Southern District of New York (Robert L. Carter, *District Judge*) found that Defendant-appellant Local 28 of the Sheet Metal Workers International Association ("Local 28" or "the Union") had violated the district court's previous orders. As a result of Local 28's contempt, the district court ordered a court-appointed Administrator to award back pay to certain nonwhite members of the Union; awarded to the plaintiffs their attorneys' fees and costs; increased Local 28's contribution to the Employment, Training, Education and Recruitment Fund (the "ETER fund"); altered Local 28's reinitiation policy; required the parties to recalculate the preexisting membership goal; imposed a hiring hall and a job rotation system (described *infra,* pp. 1179–80) both on Local 28 and on the Sheet Metal and Air Conditioning Contractors' Association of New York City, Inc. and the Sheet Metal and Air Conditioning Contractors' National Association of Long Island, Inc. (together the "Contractors"); and ordered the Administrator to appoint a person to the newly-created position of Field Monitor. *See EEOC v. Local 638,* 889 F.Supp. 642

(S.D.N.Y.1995) ("*EEOC VI*" or the "Contempt Order").

Pursuant to the district court's order, the Administrator appointed a Field Monitor, outlined his duties, directed Local 28 and the Contractors to cooperate with him, and enjoined the parties from interfering with him (the "Administrator's order"). The district court denied the Contractors' motion to vacate the Administrator's order in an opinion, dated June 6, 1995 (the "June 6 Order"). *See EEOC v. Local 638,* No. 71 Civ. 2877(RLC), 1995 WL 334688 (S.D.N.Y. June 6, 1995).

Local 28 appeals from the finding of contempt and the remedies imposed upon it by the Contempt Order. The Contractors appeal from the imposition of the hiring hall and job rotation system and from the denial of the motion to vacate.

## BACKGROUND

Because an understanding of the long history of this litigation illuminates the present dispute, we summarize the previous proceedings before turning to the issues now before us.

### A. *Prior Proceedings.*

The United States [1] commenced this case against Local 28 in 1971, alleging that Local 28 had violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* After a bench trial, the district court held that Local 28 and its Joint Apprenticeship Committee and Trust ("the JAC") had discriminated both in admission to the apprenticeship program and in direct admission to Local 28. *See EEOC v. Local 638,* 401 F.Supp. 467, 487 (S.D.N.Y.1975) ("*EEOC I*"). The district court therefore imposed a remedial racial goal of 29% nonwhite membership on Local 28 and ordered that Local 28 achieve that goal by July 1, 1981. The district court also ordered the parties to agree upon a procedure for reaching the 29% goal under the supervision of a court-appointed Administra-

---

1. The Equal Employment Opportunity Commission ("EEOC") was later substituted for the United States. *See EEOC v. Local 638,* 753 F.2d 1172, 1175 (2d Cir.1985), *aff'd,* 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

tor, although the court did impose some specific provisions, including a requirement that Local 28 and the JAC maintain lists of whites and nonwhites who sought membership into Local 28. Finally the court ordered the award of back pay to those nonwhites who had applied for membership, had their applications denied, and could show monetary damages therefrom. *Id.* at 488–91.

Soon thereafter, the district court entered an Order and Judgment ("O & J"), dated August 28, 1975. In the O & J, the district court permanently enjoined Local 28, as well as its

> officers, agents, employees and successors and all persons in active concert or participation with them in the administration of the affairs of Local 28 ... from engaging in any act or practice which has the purpose or the effect of discriminating in recruitment, selection, training, admission to membership in Local 28, admission to membership in the Local 28 Apprentice Program ... indenturing apprentices, referral, advancement, compensation, terms, conditions, or privileges of employment against any individual or class of individuals on the basis of race, color or national origin. Local 28 shall not exclude or expel any individual from membership in Local 28 or the Apprentice Program ... or fail or refuse to refer any individual for employment with sheet metal contractors, their agents, subsidiaries or successors ... on the basis of race, color or national origin, nor shall they take any other action which would deprive or tend to deprive any individual of employment opportunities with Local 28 contractors ... because of such individual's race, color or national origin. They shall ... administer all of the affairs ... so as to ensure that no individual is excluded from equal work opportunities, including but not limited to overtime and advancement, on the basis of race, color or national origin. ·

The district court also appointed David Raff to be the Administrator and ordered Raff and the parties to agree on an affirmative action program.

In response to the O & J, the Administrator proposed an Affirmative Action Program

and Order ("AAPO"), which was submitted to the district court. After considering the parties' objections, the district court modified the AAPO and adopted it in a Memorandum and Order. *See EEOC v. Local 638,* 421 F.Supp. 603, 617–20 (S.D.N.Y.1975) (*"EEOC II "*). The AAPO, as adopted by the district court, established interim nonwhite membership goals for Local 28 to meet; set nondiscriminatory criteria for membership in Local 28's apprenticeship program and for admission to journeyman status; and created very specific recordkeeping requirements for Local 28 and the JAC. *Id.* at 606–17.

Local 28 and the JAC appealed from both the findings of discrimination and the remedies imposed by the district court. This court affirmed the district court's determination of the liability issues. We also affirmed the appointment of the Administrator, the permanent injunction against Local 28, the overall membership goal for Local 28, and the apprenticeship program. We disapproved, though, of the requirement that one of the JAC's trustees be replaced with a nonwhite trustee, and we modified the district court's order to eliminate a required ratio of white to nonwhite acceptances into the apprenticeship program, on the ground that admission to the apprenticeship program should be "based on test results alone." We also modified the back pay remedy to allow the use of both testimonial and documentary evidence of an application for and a rejection of membership. *See EEOC v. Local 638,* 532 F.2d 821, 827, 829–33 (2d Cir. 1976) (*"EEOC III "*). On remand, the district court adopted the modifications in a Revised Affirmative Action Plan and Order ("RAAPO"). Over a dissent, we affirmed. *See EEOC v. Local 638,* 565 F.2d 31, 36 (2d Cir.1977) (*"EEOC IV "*).

In 1982 and 1983, the City twice moved for an order holding Local 28, the JAC, and the Contractors in contempt. In two separate orders, the district court found these parties had violated its orders by their collective efforts to thwart achievement of the membership goal, and that Local 28 and the JAC had failed to maintain proper records and data. To remedy these violations, the district court ordered the parties to make addi-

tional payments to a training fund and to pay for a computerized recordkeeping system. The district court also adopted an Amended Affirmative Action Plan and Order ("AAA-PO"), which had been proposed by the plaintiffs and the Administrator to replace the RAAPO. On appeal, we affirmed the findings of contempt, except as to the Contractors. We also affirmed the entry of the AAAPO, with two modifications: (a) we allowed the implementation of an apprenticeship examination prior to the termination of the AAAPO, and (b) we struck down a requirement that the JAC indenture one nonwhite for every white apprentice. More significantly, we affirmed the district court's adoption of a new membership goal of 29.23% on the ground that it was a permissible goal, and not a permanent quota. *EEOC v. Local 638*, 753 F.2d 1172 (2d Cir.1985) ("*EEOC V*"). The Supreme Court affirmed in a five to four decision. *Local 28 v. EEOC*, 478 U.S. 421, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986).

#### B. *The Present Proceeding.*

In July 1993, the City of New York commenced the proceedings leading to the instant appeal when it moved that Local 28 be held in contempt or, in the alternative, that the AAAPO be modified.[2] The City alleged numerous violations of the AAAPO by Local 28, including a failure to ensure or attempt to secure the same career opportunities for white and nonwhite journeypersons; a failure by Local 28 to make regular and substantial progress toward meeting the membership goal; adoption of a discriminatory reinstatement policy for those members terminated for failure to pay dues; and a failure to comply with the recordkeeping provisions of the AAAPO. The City submitted the affidavits of nonwhite members of the Union to demonstrate that union business agents discriminated in referring nonwhites to contractors for job opportunities, as well as evidence that Local 28 had failed to invoke various collective bargaining provisions that might create a more equitable distribution of employment opportunities between white and nonwhite members. In addition, the City

put into evidence the affidavits of an expert, which demonstrated a significant disparity in hours worked by white and nonwhite journeypersons. Among the remedies requested by the City for Local 28's alleged contempt were a hiring hall, through which the Contractors would be required to hire most of their new workers, and a job rotation system, in which the Contractors would be required to lay off employees who had worked more than a certain number of hours in the past year and to hire workers from the hiring hall in their place.

In March 1994, after negotiations to settle this dispute broke off, Local 28 filed its opposition papers to the contempt motion. Included within these submissions was Local 28's own evidence to support its arguments that (1) the Union's business agents did not act in a discriminatory manner; (2) the statistical disparity in hours did not exist and, in any event, was not attributable to Local 28; (3) the failure to invoke collective bargaining provisions had no effect on the hours worked by nonwhite journeypersons; and (4) the recordkeeping violations, which were conceded, could not lead to any inference that the Union had engaged in any other violations. Local 28 also challenged the request for an award of back pay and a change to the membership goal. Local 28 did stipulate to a revised policy for the reinstatement of suspended members, the acquisition of a new computerized recordkeeping system, and the establishment of the hiring hall and job rotation system.

The Contractors, who were not charged with contempt by the City, filed their own papers in opposition to the imposition of both the hiring hall and the job rotation system. They submitted affidavits from various contractors stating that a hiring hall and a job rotation system would have a deleterious impact on their ability to compete with non-union contractors and would interfere with their ability to estimate accurately the cost of projects.

---

**2.** Plaintiff-appellee EEOC did not join the motion below, but has filed a brief in support of the City

in this court.

On February 23, 1995, the district court found in favor of the City and entered the Contempt Order, which was amended on March 6, 1995. On April 14, the Administrator appointed Charles Saunders to the position of Field Monitor, outlined Saunders's duties, directed Local 28 and the Contractors to cooperate with him, and enjoined the parties from interfering with him. The Contractors moved the district court to vacate the Administrator's order. The district court denied the motion in the June 6 Order.

## DISCUSSION

### A. *Liability for Contempt.*

 A party may not be held in contempt unless "the order violated by the contemnor is 'clear and unambiguous,' the proof of non-compliance is 'clear and convincing,' and the contemnor was not reasonably diligent in attempting to comply." *United States v. Local 1804–1, Int'l Longshoremen's Ass'n*, 44 F.3d 1091, 1096 (2d Cir.1995). The violation, though, need not be willful. *See EEOC V*, 753 F.2d at 1178. Ordinarily, we review the district court's legal determinations de novo and its factual determinations for clear error, but, because the power of a district court to impose contempt liability is carefully limited, our review "of a contempt order for abuse of discretion is more rigorous than would be the case in other situations in which abuse-of-discretion review is conducted." *Local 1804–1*, 44 F.3d at 1096.

Local 28 argues that none of the foregoing requirements for contempt has been met. However, the Union does not seriously contend that either the O & J or the AAAPO was unclear or ambiguous, nor would such a claim, based on the fact that they proscribed discrimination generally, have any merit. *See, e.g., New York State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1351–52 (2d Cir.1989) (injunction containing prohibitions on "tortious harassment" and allowing only "reasonably quiet conversation" was "sufficiently clear"). Instead, the principal contentions of the Union are that there was insufficient evidence to support the contempt finding and that the Union has been reasonably diligent in attempting to comply with the court's orders.

In finding the Union in contempt, the district court pointed to four categories of evidence: (1) the violations of the recordkeeping requirements of the O & J and the AAAPO, (2) the failure of Local 28 to meet the membership goal of the AAAPO, (3) the failure of the Union to provide equal work opportunities to its nonwhite journeypersons, and (4) the Union's discriminatory reinstatement policy. In its attack upon the contempt finding, Local 28 contends that: (i) the recordkeeping violations should not have been taken into account in the contempt proceeding, (ii) the failure to meet the membership goal cannot be the basis for a finding of contempt, (iii) there is no evidence that Local 28 provides unequal work opportunities to nonwhite members, and, finally, (iv) the reinstatement policy did not violate any court order. We address each argument in turn.

### 1. *The Membership Goal.*

 The membership goal had its genesis in the AAPO (adopted by the district court in 1975) and was modified to its present form in the AAAPO. In previous appeals to this court and to the Supreme Court, the Union claimed that the membership goal constituted an impermissible racial quota. We rejected that interpretation, as did a Supreme Court majority. *See Local 28*, 478 U.S. at 475–79, 106 S.Ct. at 3049–52 (Brennan, J., plurality opinion); *id.* at 484–89, 106 S.Ct. at 3054–57 (Powell, J., concurring in part and concurring in the judgment); *EEOC V*, 753 F.2d at 1186–87. The district court understood that the membership goal could not function as a quota and could not be the sole basis for the finding of contempt. It specifically held that the goal was being used only as a "benchmark" against which "to measure whether defendants are complying with the court's order." *EEOC VI*, 889 F.Supp. at 659.

The Union argues that even the limited use of the membership goal as a piece of evidence from which to infer continuing discrimination is not permissible under the Supreme Court's decision in *Local 28*. *But see Local 28*, 478 U.S. at 487, 106 S.Ct. at 3056 (Powell, J., concurring in part and concurring

in the judgment) ("A goal is a means, useful in limited circumstances, to assist a court in determining whether discrimination has been eradicated."). We need not reach that argument, however, because the district court specifically held that there were numerous other bases for the contempt finding. *See EEOC VI*, 889 F.Supp. at 658–59. Accordingly, although we affirm the district court's contempt finding (with one exception noted below), we do so by relying on grounds other than the union's failure to attain the membership goal.

### 2. The Recordkeeping Violations.

■ The district court found that "[d]espite the plan's unequivocal mandate that the union compile and keep the requisite information, at least since 1984 Local 28's maintenance of its records has been irresponsible and sloppy at best, and purposefully deceptive at worst." *Id.* at 652–53. Not only has Local 28 failed to maintain proper records, but it has frequently submitted inaccurate and misleading information, resulting in the inflation of its nonwhite membership. *Id.* at 653–54. As a result, the district court found that "the sheer volume of mishaps and gross incompetence has led the court to be 'convinced that ... [the Union's] violation ... reflect[ed] defendant's unwillingness to comply with [the affirmative action plan].'" *Id.* at 655 (quoting *EEOC V*, 753 F.2d at 1182).

Local 28 does not deny that it has failed to comply with the district court's orders as they pertain to recordkeeping. Rather, the Union attempts to downplay the significance of such violations by claiming that the process of complying with the AAAPO's recordkeeping provisions has been complicated and that the Union's occasional failures are not so great as to justify a finding of contempt.

This argument ignores the overwhelming evidence. The AAAPO was originally entered in 1983 and affirmed in 1985, more than eight years prior to the commencement of these contempt proceedings. We agree with the district court's characterization of Local 28's efforts at compliance during that period as "irresponsible and sloppy." The errors here were not mere clerical mistakes, but instead tend to demonstrate that Local

28 has systematically attempted to undercount white membership and overcount nonwhite membership. The district court properly found Local 28 in contempt.

Local 28 also contends that even if its recordkeeping violations amount to contempt, those errors justify only the entry of the stipulated changes to the recordkeeping system. We agree that these violations, by themselves, would not justify most of the remedies imposed by the district court. But the Union's consistent failure to report accurately nonwhite membership figures serves as yet another piece of evidence of Local 28's failure to provide equal employment opportunities to all of its members, as we discuss below.

### 3. The Union's Failure to Provide Equal Employment Opportunities to its White and Nonwhite Members.

■ The O & J specifically enjoined the Union from taking any actions that would "deprive or tend to deprive any individual of employment opportunities with Local 28 contractors." The AAAPO requires that "all members ... of Local 28 share equitably in all available employment opportunities in the industry." The district court found that the Union had violated both of these provisions. It based this conclusion on a review of the statistical evidence, the evidence that the Union's business agents discriminate in their referral practices, and the Union's failure to take other affirmative steps to ensure equal employment opportunities for all of its members. *See EEOC VI*, 889 F.Supp. at 660–64. Local 28 claims both that there has been no showing that the disparity in hours worked by whites and nonwhites is attributable to race, and that even if it is, the blame for that disparity lies only with the Contractors.

In the district court, the City submitted affidavits from its expert, Dr. Bernard Siskin, who is an adjunct professor at Temple University Law School and has a Ph.D. in statistics from the University of Pennsylvania. Dr. Siskin found that Local 28's nonwhite journeypersons had worked a statistically significant fewer number of hours than their white counterparts between 1981 and 1994. Dr. Siskin took a number of steps to

ensure that a person's unavailability for work would not skew the study. For example, he eliminated from the study those journeypersons who had been ineligible for work at some point during a particular year and those persons who had not worked any hours during that year. He also performed various regression analyses to determine whether a factor other than race, such as a member's seniority, residence, or specialized skill, could be responsible for the disparity. Despite all of these safeguards, Dr. Siskin's study still showed that nonwhite journeypersons worked significantly fewer hours than their white counterparts.

Local 28 claims that Dr. Siskin failed to include in his analysis several important variables: skill level, education, and motivation. *See Sobel v. Yeshiva University,* 839 F.2d 18, 34 (2d Cir.1988), *cert. denied,* 490 U.S. 1105, 109 S.Ct. 3154, 104 L.Ed.2d 1018 (1989). None of these arguments has merit. First, contrary to Local 28's argument, Dr. Siskin did control for skill level, and the Union's real complaint is that he did not pick the correct proxy. The court was entitled to reject Local 28's view. *See Bazemore v. Friday,* 478 U.S. 385, 400–01, 106 S.Ct. 3000, 3009, 92 L.Ed.2d 315 (1986). Second, the district court, after a trial on the merits, previously held that a high-school diploma is not required because it is not related to job performance. *See EEOC I,* 401 F.Supp. at 482. Because the Union submitted no new evidence that would suggest that education is any more relevant to the job performance of sheet metal workers today than it was twenty years ago, we cannot find fault with Dr. Siskin's failure to control for education. *See Sobel,* 839 F.2d at 34. Finally, Local 28's motivation argument is specious. The Union has made absolutely no showing that whites are any more motivated than nonwhites or that controlling for motivation would somehow account for the racial disparity. *See id.*

The primary evidence that Local 28 submitted to oppose the City's statistical showing was the affidavits of Dr. Richard Buchanan. Dr. Buchanan's work has been previously criticized by both the district court and the Administrator. *See EEOC VI,* 889 F.Supp. at 650. The district court found his analysis no more compelling this time, *id.* at 650–52, and we note that Local 28 has not attempted to rely on him in this court. We find that the district court's holding that there is a statistical disparity in hours worked is well supported by the evidence.

■ Local 28 next attempts to escape from contempt liability on the ground that it should bear no responsibility for the disparity. It claims that the Collective Bargaining Agreement ("CBA") in effect between Local 28 and the Contractors grants the Contractors unlimited power over the hiring and firing of members of the Union and that all employment is at-will. Furthermore, according to Local 28, its actions and those of its agents have, at most, a de minimis impact on contractor hiring. Thus, any disparities that exist are the result of discrimination by the Contractors, not by Local 28, and therefore the finding of contempt should be reversed. Local 28's arguments mischaracterize both the district court's holding and prior orders.

The district court previously found that, both before and after the commencement of this litigation, Local 28 has engaged in repeated and pervasive acts of discrimination against its nonwhite members. *See, e.g., EEOC V,* 753 F.2d at 1177; *EEOC III,* 532 F.2d at 824; *EEOC I,* 401 F.Supp. at 476–87. In its effort to eliminate this ongoing discrimination by Local 28, the district court did not simply enjoin the Union from engaging in further discriminatory practices with regard to admission to the Union; it required that the Union take action to ensure that a non-discriminatory, race-neutral market existed for workers in the sheet metal industry. Thus, as we noted above, the O & J ordered Local 28 not to take any actions that would deprive members of employment opportunities. The district court found that Local 28 had violated this clear order.

■ The district court found that the Union's business agents had engaged in discriminatory practices in their referrals to the Contractors. The evidence before the district court on this issue was in conflict. The City submitted the affidavits of nonwhite members of the Union who had received little or no assistance from the Union's busi-

ness agents in finding jobs, and whose personal experience was that business agents would aid nonwhite members only reluctantly. Local 28 responded with its own affidavits from nonwhite members who testified that they had experienced no discrimination in the union, as well as the affidavit of one of its lawyers attempting to discredit the testimony of the City's witnesses. The district court also had before it the evidence of Local 28's prior resistance to its orders and its inflation of nonwhite membership in the records submitted to the court, from which the court could infer discriminatory intent. *Cf. Binder v. Long Island Lighting Co.*, 57 F.3d 193, 200 (2d Cir.1995) ("[R]esort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt...."). The district judge, after reviewing the evidence from both sides, credited the evidence from the City over that of Local 28.

 Even under the more strenuous standard for a contempt proceeding, we cannot say that the district court's finding that the Local 28 business agents discriminated constituted clear error. In *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), the Supreme Court held that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." In *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985), the Court clarified that

> [i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.

This rule applies to all district court factual determinations, including those based on documentary evidence or inferences that are drawn from other facts. *Id.* at 574, 105 S.Ct. at 1511–12. We are mindful that the clearly

erroneous standard is more stringent when we review the district court's finding of contempt, which must be found by clear and convincing evidence, not just by a preponderance of the evidence. *See Local 1804–1*, 44 F.3d at 1096. Nonetheless, we must give due deference to the district court's factual determinations. Here, the district court faced two conflicting versions and found the City's version more convincing. We cannot say that we are left with any conviction, let alone a definite and firm one, that the district court erred.

 Local 28 also argues that even if its business agents have discriminated, the effect of that discrimination was de minimis because business agents account for only two percent of the total hours worked by journeymen. Assuming, as we must, that Local 28's business agents have engaged in discrimination against nonwhite journeypersons, this effect is not de minimis. The O & J is explicit in stating that Local 28 is not to deprive its members of employment opportunities based on race. The hours worked by Local 28 journeypersons in the average year is in the millions, and two percent of that is by no means an insignificant number of hours for Local 28 to be distributing unequally among its members. The district court was correct to reject this argument.

 The district court also relied on the Union's failure to invoke two CBA provisions which might have created additional job opportunities for nonwhite members. The first provision, Art. V, § 6 of the CBA, provides that "[w]henever, in the opinion of the Union, unemployment has risen to the point where some corrective action, in its opinion, should be taken, the Manpower Committee shall meet within forty-eight (48) hours to attempt to place the men in jobs." *EEOC VI*, 889 F.Supp. at 662. Local 28 does not deny that it has not called for a meeting of the Manpower Committee. Instead, it posits that there is no evidence that "such a meeting would have had any impact on the hours disparity." Brief of Local 28 at 27. But Local 28 fails to articulate any reason why invoking this provision would not have affected the hours disparity. On its face, § 6 would seem to have at least some promise to

reduce the hours disparity by forcing the Contractors to focus on the problem. Because Local 28 never tried to use this provision and there was no evidence to prove that it would not have worked, the district court could properly infer that § 6 might have reduced the hours disparity.

In any event, Local 28's argument misapprehends the Union's responsibilities and obligations under the O & J. The O & J requires the Union to "administer all of the affairs of Local 28 ... so as to ensure that no individual is excluded from equal work opportunities, including but not limited to overtime and advancement, on the basis of race, color or national origin." The evidence was overwhelming that nonwhite journeypersons were working significantly fewer hours than their white counterparts, yet Local 28 took no steps to alleviate the problem (indeed, the district court found that its business agents were actively exacerbating the problem). Under the O & J, Local 28 was required to take those steps that were within its power to eliminate this disparity. The failure to invoke § 6 and to attempt to reduce the disparity was a direct violation of the O & J.

■ The district court also pointed to Art. V, § 7, which states that "[d]uring periods of unemployment there shall be established a mandatory two-week furlough system. The procedures to be adopted and/or formulated concerning said furlough system shall be referred for consideration to a joint subcommittee consisting of both management and labor." *EEOC VI,* 889 F.Supp. at 662. Again Local 28 argues that for this provision to reduce the hours disparity would require the agreement of the Contractors and that there is no evidence that the Contractors would have agreed to the furloughs. But again, Local 28 misses the point: it was under an explicit obligation to take all steps in its power to try to reduce the hours disparity, even if unsuccessful. The Union did not do so.

Accordingly, we find no error in the district court's holding Local 28 in contempt for failing to provide equal employment opportunities to all of its members regardless of race.

#### 4. *The Reinstatement Policy.*

■ A Local 28 member who fails to pay his dues for two months is automatically suspended from membership. To be reinstated, he must pay the past due amounts, plus a $25 reinstatement fee. In late 1988, Local 28 adopted a policy whereby members who had been suspended for more than two years would not be reinstated. Under this new policy, never formally adopted or communicated to Local 28's membership, a member could appeal the denial of reinstatement to the Union's Executive Board, whose decision was final. *EEOC VI,* 889 F.Supp. at 664–65.

The City submitted statistical evidence to the district court showing that a disproportionate share of the persons suspended under the Union's policy were nonwhite. According to the City, because nonwhite journeypersons were terminated at a higher rate than their white counterparts, the policy of restricting reentry after two years disproportionately affected nonwhite members, a violation of ¶ 1 of the O & J. The City also submitted the affidavits of several dismissed nonwhite members who allegedly had been denied an appeal hearing before the Executive Board, or whose appeals had been rejected. Finally, the City submitted evidence that similarly situated white members had received different treatment.

Local 28 submitted its own evidence in rebuttal, claiming that two of the nonwhite journeypersons who had been denied reentry had substance abuse problems and that the white journeypersons were not similarly situated to the nonwhites. Local 28, however, submitted no evidence showing that any white members had been denied readmission, nor that any nonwhite members had been reinstated under the policy.[3] Local 28 also

---

**3.** On appeal, Local 28 argues that three nonwhite members were readmitted under the policy. This evidence, however, was never brought to the attention of the district court and is derived solely from massive computer printouts attached to the Affidavit of Hilary Klein, an attorney for the plaintiffs, without any additional information concerning the circumstances of the reinitiation. Because this evidence was not properly tendered

submitted statistical evidence from. Dr. Buchanan to show that no disparate impact existed.

The district court found that Local 28's new reinstatement policy for suspended members discriminated against nonwhites under both a disparate treatment and a disparate impact approach. Based on the evidence before the district court, we cannot say that this was clear error. As we noted above, the district court was fully entitled to rely on Dr. Siskin and not on Dr. Buchanan. Because we can affirm on the disparate impact ground, we need not reach the court's disparate treatment ruling.

 We agree with Local 28, however, that the district court erred when it extended its contempt finding to cover other conditions (fees and back dues payments) imposed by the Union for nonpayment of dues additional to the two-year limitation on reinitiation. We agree with Local 28 that the City challenged only the two-year limitation. A party charged with contempt of court (except where the contempt is made in court and is summarily punished) is entitled to notice and an opportunity to be heard. *See Taylor v. Hayes,* 418 U.S. 488, 496–500, 94 S.Ct. 2697, 2702–04, 41 L.Ed.2d 897 (1974). Local 28 was given no opportunity to address whether the other aspects of its policies concerning the non-payment of dues violated the court's orders. Thus, we affirm only the finding that the two-year limitation is a contempt, and vacate the district court's other findings regarding Local 28's membership policies. On remand, the district court is free to consider, upon appropriate notice to Local 28, whether any of the other membership conditions violate its orders.

### 5. *Local 28's Diligence.*

 A party may not be held in contempt unless the district court finds that the party was not "reasonably diligent in attempting to comply." *Local 1804–1,* 44 F.3d at 1096. The district court found that the evidence submitted by the Union showed only that it had complied reluctantly with orders to remedy its violations of the law and

that it had been willing to come into compliance with the court's orders after a contempt motion had been filed. *EEOC VI,* 889 F.Supp. at 667–68. Thus, according to the court, there was no evidence that the Union was reasonably diligent. Once again, we are unable to conclude that the district court's decision was clear error. Based on the gross recordkeeping violations alone, the court could find that the Union had not been reasonably diligent.

To summarize, we affirm the district court's finding that Local 28 was in contempt of court for failing to provide equal employment opportunities to all of its members and for violating the recordkeeping requirements of the district court's previous orders. We also affirm the finding that Local 28's imposition of the two-year limitation on reinitiation was contumacious, but vacate the court's holding of contempt based on the Union's other membership conditions. Because the findings that we affirm are sufficient to support the district court's ultimate contempt holding, there is no need for us to consider whether the district court could properly use Local 28's failure to reach the membership goal to support its finding of contempt.

### B. *The Remedies.*

As remedies for the contempt, the district court ordered that the Union provide back pay to certain nonwhite journeypersons, make additional contributions to the ETER fund, and pay the plaintiffs' attorneys' fees and costs. The district court also modified the reinitiation policy and ordered the parties to commence negotiations for a new membership goal. Finally, at the request of the City and the Union, the district court ordered that Local 28 and the Contractors initiate a hiring hall and job rotation system. Local 28 challenges each of these remedies, including the hiring hall and job rotation system, except for the award of attorneys' fees and costs. The Contractors challenge the hiring hall and the job rotation system.

### 1. *The Back Pay Award.*

 The district court's order required the Administrator to hold hearings to

to the district court, we refuse to consider it here

for the first time.

grant back pay to all journeypersons whose actual hours worked were two or more standard deviations below their "expected" hours worked, who were available for and were actively seeking work, and who mitigated their damages. *EEOC VI*, 889 F.Supp. at 685. In a civil contempt proceeding, such as this one, sanctions may be used either to coerce the defendant into complying with the district court's orders or to compensate the victim of the defendant's contemptuous conduct. *Local 28*, 478 U.S. at 443, 106 S.Ct. at 3033. The district court relied on both rationales, but we find that neither withstands scrutiny.

■■■■ In deciding whether to impose a coercive remedy, the district court must consider "(1) the character and magnitude of the harm threatened by the continued contumacy; (2) the probable effectiveness of any suggested sanction in bringing about compliance; and (3) the contemnor's financial resources and the consequent seriousness of the burden of the sanction upon him." *Dole Fresh Fruit Co. v. United Banana Co.*, 821 F.2d 106, 110 (2d Cir.1987). The district court's ultimate decision need only be reasonable, and we review a coercive sanction for abuse of discretion. *See Perfect Fit Indus. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

In opposition to the City's request, Local 28 submitted the affidavit of Gary Topple, a Certified Public Accountant. Attached to Topple's affidavit were Local 28's consolidated financial statements for 1992 and 1991, and for the first nine months of 1993. The balance sheets for those years revealed that the union's total assets were no greater than $2.477 million. The City's own expert estimated that the total wages lost by nonwhite workers could easily exceed $12 million.

The district court also rejected Topple's testimony to the effect that the Union could cut expenses no further and found that there was no evidence that the Union's expenses would be increasing over the next few years. The district court, however, failed to address the potentially disastrous financial impact of the back pay award, and, in the face of the unrebutted evidence that such a large award would bankrupt the Union, the decision to impose this coercive remedy was an abuse of discretion.

■■■■ A compensatory remedy "should reimburse the injured party for its actual damages." *Terry*, 886 F.2d at 1353. The district court's award does not limit an award only to those nonwhite journeypersons who have been damaged but, instead, grants back pay to those qualifying journeypersons who were actively seeking work and mitigated their damages. Under the district court's approach, a journeyperson would be entitled to receive damages even if there was a legitimate non-discriminatory reason that would explain why the journeyperson was not hired. For instance, a journeyperson could have a poor work history of which employers became aware after checking his references, or the journeyperson might only have sought work from contractors who were looking for someone more skilled. Indeed, it may even be the case that the Union can show that a particular journeyperson was unemployed, not because of its own discrimination, but rather, because the contractors were illegally discriminating against the journeyperson. In the foregoing situations, a back pay award would be inappropriate. The Union can only be required to compensate the victims of its own discriminatory acts. Accordingly, because the district court's back pay award in this case was not sufficiently tailored to compensate actual victims of the Union's discrimination, we vacate the district court's order directing the Administrator to hold hearings on the amount of back pay, and we remand that issue to the district court to fashion a remedy that compensates with back pay only those journeypersons who were denied work because of the Union's discriminatory conduct.

### 2. *ETER Fund Contributions.*

■■■■ The district court instructed the Administrator "to submit to the court a proposal for raising the ETER Fund contribution to a level that will cost the union enough money to provide an incentive to meet the membership goal and that will fully fund the activities that this court intended the Fund to perform." *EEOC VI*, 889 F.Supp. at 686.

The district court further stated that "the Administrator is instructed to submit to the court a schedule of interim goals accompanied by reporting requirements to determine whether the union has met the interim goals." *Id.*

According to the record before us, the Administrator has not yet submitted his report, so we are unable to determine whether the specific increase in Local 28's contributions to be proposed by him will constitute error. Thus, at this point we can only state our approval of the district court's general use of an increase in the ETER fund as a method of coercing Local 28 to comply with the court's prior orders, and as a remedial tool. This general approval, however, is without prejudice to a subsequent contention by the Union, in the district court or in this court, that the actual increases in the ETER fund ordered by the district court do not accord with the requirements of either compensatory or coercive remedies.

### 3. The Reinstatement Policy.

Local 28 also contests the district court's rejection of the parties' stipulated changes to the reinstatement policy and its order that the parties and the Administrator meet to formulate a new policy that, among other things, exempts any nonwhite journeyperson from the payment of a reinstatement fee and the payment of dues for the suspended period. Local 28 argues that this is an impermissible "race-conscious" remedy. *See Adarand Constructors, Inc. v. Pena,* — U.S. —, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

Having earlier in this opinion vacated that portion of the district court's order that found that all of the Union's sanctions for nonpayment of dues, not just the two-year limitation on reinstatement, to be a contempt of court, it follows that we now vacate the district court's remedial order relating to the reinstatement policy with the exception of the district court's rejection of the two-year limitation period for a reinstatement application. In affirming that part of the order, we agree with the district court that the new policy must "permit former members who were suspended or terminated from membership as a result of nonpayment of dues to apply for readmission at any time, regardless of the date of their suspension." *EEOC VI,* 889 F.Supp. at 687. A system that allows reinstatement without a limitations period is nondiscriminatory and is a proper remedy for acts challenged by the plaintiffs. On remand, the district court is free to consider whether other aspects of the Union's membership policies constitute contempt, provided the defendants are given notice and an opportunity to be heard.

### 4. The Membership Goal.

■ The district court also ordered the Administrator and the parties to reformulate the membership goal, to account for both the demerger of Local 28, which created a separate local for Northern New Jersey, and shifts in population since 1989, as reflected in the 1990 census. The Union claims that this violates our decision in *Patterson v. Newspaper & Mail Deliverers' Union,* 13 F.3d 33, 39 (2d Cir.1993), *cert. denied,* — U.S. —, 115 S.Ct. 58, 130 L.Ed.2d 16 (1994), in which we held that a district court decree need not reflect demographic changes when the court had already held that the earlier decree had achieved its purposes. *Patterson,* however, undermines Local 28's argument. We held in *Patterson* that a flexible standard should be applied to the decision to vacate a consent decree once its primary purpose has been achieved. *Id.* at 37–38. Here, the primary purpose of the district court's orders has been to eliminate discrimination, and the district court, sitting as a court of equity, should have broad discretion to adjust the membership goal when circumstances warrant. *Id.* Because it is undisputed that large shifts in Local 28's membership have occurred since the goal was last modified, the court's decision to recalculate the goal was proper.

In its reply brief, Local 28 for the first time argues that a change in the membership goal would be unconstitutional. This issue was litigated earlier in this case, and the Supreme Court has made clear that the membership goal is just that—it is just a goal and is not a quota. *See Local 28,* 478 U.S. at 475–79, 106 S.Ct. at 3049–51 (Brennan, J., plurality opinion); *id.* at 484–88, 106 S.Ct. at 3054–56 (Powell, J., concurring in

part and concurring in the judgment). Thus, the argument lacks merit. In any event, Local 28 waived this issue by failing to raise it in the opening brief. *See Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation,* 605 F.2d 648, 653 n. 3 (2d Cir.1979). We affirm the district court's order that the membership goal be reformulated.

### 5. *The Hiring Hall and Job Rotation System.*

The Contractors challenge the district court's imposition of both the hiring hall and the job rotation system on the grounds that these remedies would impose an impermissible burden on them and violate the Constitution and Title VII. Despite agreeing to the hiring hall and the job rotation system in the district court, Local 28 now joins the Contractors in arguing that these remedies are unconstitutional.

Under the plan proposed by the City and endorsed by the district court, the Contractors would be required to hire eighty percent of their workers during a twelve-month period from a hiring hall. The hiring hall would refer unemployed journeypersons to the Contractors based on a numerical system in which a journeyperson would be ranked according to the number of hours he had worked over the current and the most recent past year, with the person with the least number of hours placed first on the list. A journeyperson who is laid off by three consecutive employers for lack of productivity, however, would be placed at the bottom of the list. Journeypersons would be asked to designate any special skills they have, such. as roofing, welding, or operating CAD/CAM equipment. If a contractor needed someone with a special skill, the person with the lowest number of hours possessing that skill would be referred. If a person is laid-off because the person is found to be unqualified in his special skill, that person would be placed back on the list but would no longer be listed as having that skill.

The job rotation system requires each contractor to designate eighty percent of its workers as nonbasic. Under the system, any journeyperson considered nonbasic must be laid off after working more than 1200 hours in a fifty-two week span; basic workers must be laid-off after working 1680 hours over the same span of time. Those laid-off would return to the hiring hall, but could not work for the same contractor for one year, after which they could be rehired as part of the twenty percent not hired under the hiring hall.

The job rotation system would not go into effect until at least one year after the implementation of the hiring hall, and only if (1) the number of hours worked by nonwhite journeypersons is more than one standard deviation below the number of hours expected to be worked by such journeypersons (based on the nonwhite percentage of membership in the Union), and (2) unemployment among all of the journeyperson members of Local 28 has averaged 10% or more.

The problem with the hiring hall and the job rotation system as they affect the Contractors is that the Contractors have never been found liable for discrimination. They have been joined as defendants in this action only to effectuate the relief granted against the other defendants and because they are indispensable parties under Fed.R.Civ.P. 19(a). *See EEOC V,* 753 F.2d at 1175 (citing *EEOC III,* 532 F.2d at 824 n. 3). On appeal, the Contractors argue that, because they have never been found liable, the district court's imposition of the hiring hall and job rotation system as to them exceeded its remedial powers. Alternatively, they argue that these remedies violate the Equal Protection Clause guarantees under the Fifth and Fourteenth Amendments.

In *General Building Contractors Association, Inc. v. Pennsylvania,* 458 U.S. 375, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), the district court had found that the petitioners in that case had violated 42 U.S.C. § 1981 and the court had imposed injunctive relief against them. The Supreme Court reversed, holding that there was no basis for the finding that the petitioners had violated § 1981. However the respondent argued that the district court, as part of its injunction against liable parties, could impose injunctive relief against the petitioners under its inherent equitable powers or under the All Writs Act, 28 U.S.C.

§ 1651(a). The Court rejected these arguments and held that a nonliable party could only be subject to provisions of an injunction that were "minor and ancillary". *Id.* at 399, 102 S.Ct. at 3154. The Court further held that the remedies imposed by the district court were neither minor nor ancillary because they placed considerable burdens on the petitioners, including requirements that they meet certain "minority utilization goals," make quarterly reports detailing their compliance, and bear a share of the financial cost of implementing the injunction. *Id.* at 399–400, 102 S.Ct. at 3155.

It is plain to us that, as remedies imposed against the Contractors in this case, neither the hiring hall nor the job rotation system is minor or ancillary. The hiring hall sharply curtails an employer's hiring discretion by requiring that eighty percent of new hires come from the hiring hall. For this reason, the Contractors have consistently resisted the efforts of Local 28 to create a hiring hall.

The City and the EEOC argue that because other courts (including the district court in *General Building Contractors* on remand) have upheld alterations to existing hiring halls as remedies in employment discrimination cases, we should affirm the district court's decision. *See, e.g., EEOC v. Local 580,* 669 F.Supp. 606, 622 (S.D.N.Y. 1987), *aff'd,* 925 F.2d 588 (2d Cir.1991); *Pennsylvania v. Local 542,* 619 F.Supp. 1273, 1279 (E.D.Pa.1985), *aff'd,* 807 F.2d 330 (3d Cir.1986). But there is a difference between a change to an existing hiring hall and the imposition of a new one. As the Court noted in *General Building Contractors,* "adjustment[s] in the collective-bargaining contract" may be appropriate. 458 U.S. at 400, 102 S.Ct. at 3155. What the district court ordered here, however, is not an "adjustment;" rather it is a major alteration in the relationship between Local 28 and the Contractors. We do not agree with the district court that, as against the Contractors, the imposition of the hiring hall constitutes relief that is minor and ancillary.

If the hiring hall is not minor and ancillary, the job rotation system is even less so. Even when an employer has been found to engage in discriminatory practices, the Supreme Court has resisted requiring the layoff of workers as a remedy. *See, e.g., Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986) (striking down as unconstitutional a plan which required that white teachers be laid-off before nonwhite teachers). Even though the Contractors have not been found liable, under certain conditions the job rotation system would require them to layoff their workers and replace them with other workers. *General Building Contractors* makes it plain that such a system is neither minor nor ancillary.

This does not mean that the district court is barred from ordering relief which poses some burdens on the Contractors. For instance, the district court is free to order the Contractors to make reports to the district court. *See General Bldg. Contractors,* 458 U.S. at 405, 102 S.Ct. at 3157 (O'Connor, J., concurring) ("It is ... conceivable ... that quarterly reports providing employment statistics necessary for the court to ascertain whether its injunctive decree is being properly implemented could be ordered...."). In addition, as the Contractors note, the district court could alter Local 28's referral process by removing those business agents who have been found to be discriminating against nonwhite employees, or by eliminating business agent referrals altogether, and replacing them with a system patterned after the hiring hall, which could be termed a referral hall, in which journeypersons are referred to employers based on the number of hours worked but the Contractors retain the discretion whether to hire any individual worker. However, in ordering relief that affects the Contractors, the district court must take care to ensure that any additional burdens placed on the Contractors are truly "minor and ancillary."

If the plaintiffs wish to have sanctions imposed on the Contractors or to fashion remedies as to them that are more than minor and ancillary, they may do so only upon establishing the Contractors' liability after adhering to the appropriate rules of civil procedure. Until such time, if ever, that the Contractors are properly adjudged to

have violated Title VII, the remedies imposed against the Contractors may be no more than minor or ancillary, in conformity with *General Building Contractors*.

Because we reverse the imposition of the hiring hall and the job rotation system as neither minor nor ancillary, we do not reach the Contractors' constitutional arguments. *Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *Jews for Jesus, Inc. v. Jewish Community Relations Council*, 968 F.2d 286, 290 (2d Cir.1992).

## C. The June 6 Order.

■ In its Contempt Order, the district court ordered

> the union to pay for a field monitor, who will be chosen by and work under the supervision of the Administrator to check the accuracy of the reports filed by the union pursuant to the AAAPO and the requirements of the hiring hall and work share program. The monitor may visit work sites to ensure that the people who the union and the contractors report as working there are actually doing so, or he may use whatever methods the Administrator deems to be necessary.

889 F.Supp. at 687. On April 14, 1995, the Administrator, in a written order, appointed Charles Saunders to be the Field Monitor, spelled out Saunders's duties, enjoined Local 28 and the Contractors "from interfering with or impeding the Field Monitor in carrying out his duties, and from retaliating against any person who talks with, or wishes to talk with, the Field Monitor," and directed Local 28 and the Contractors to cooperate with Saunders by providing him with access to certain sources of information. The Contractors moved to vacate the Administrator's order, but the district court denied the motion. The Contractors appeal on the grounds that the Administrator's order exceeded his power, that the order was overly broad and intrusive, and that the injunction was improper.

While district courts have long had the power to appoint special masters to aid them, only recently have special masters been used

to implement the district courts' orders. *See United States v. Yonkers Bd. of Educ.*, 29 F.3d 40, 44 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2608, 132 L.Ed.2d 853 (1995). Nonetheless, we have held that the use of a special master in such circumstances is permissible so long as the master's powers are "tailored to cure the ... violation." *Id.* Indeed, in *Local 28* the Supreme Court noted that "in light of the difficulties inherent in monitoring compliance with the court's orders ... appointment of an administrator was well within the District Court's discretion." 478 U.S. at 482, 106 S.Ct. at 3053. We conclude that just as the district court had authority to appoint the Administrator, the Administrator had authority to appoint, and thereby delegate a portion of his responsibility to, a Field Monitor; to delineate the Field Monitor's duties; and to indicate the information to which the Field Monitor should be provided access.

■ With a single exception, we do not think that the Administrator's order violates *General Building Contractors*'s prohibition on burdensome remedies. The provisions of the order are, for the most part, carefully tailored to monitor the union's compliance with the district court's orders. We agree with the Contractors, however, that the requirement that the Contractors cooperate "in efforts to investigate and conciliate job related complaints" is overly broad. As the district court noted, the Administrator has been granted "broad powers to effectuate compliance on the part of Local 28 with the [district] court's affirmative action plan and orders." June 6 Order at 8. We cannot see, however, how granting the Field Monitor the power to investigate and conciliate complaints that union members may have with their employers (the Contractors) is related to the AAAPO, the O & J, or any of the district court's other orders. Instead, this portion of the Administrator's order seems to us to be an intrusion into an area of labor relations that has traditionally been the province of the National Labor Relations Board. Therefore, we strike that clause from the Administrator's order.

**1182**

We also agree with the Contractors that it was improper for the Administrator to enter an injunction against the Contractors. Unless the parties consent, federal magistrates are not permitted to hear motions for injunctive relief. 28 U.S.C. § 636(b)(1)(A). We do not think that the Administrator, who is only a court-appointed special master, can have any more authority than that which Congress has granted to a magistrate. Furthermore, the Administrator, in purporting to enjoin the Contractors, did not address any of the factors we have required district courts to consider, including irreparable harm, likelihood of success, the balance of hardships, and the public interest. *See Able v. United States,* 44 F.3d 128, 130–31 (2d Cir.1995). Therefore, it was error for the district court to refuse to vacate the injunctive portion of the Administrator's order, and we remand this issue to the district court for reconsideration. In all other respects, we affirm the June 6 Order.

### CONCLUSION

The finding of contempt against Local 28 is affirmed, except that we vacate so much of the district court's decision as held that Local 28's membership policies—other than the two-year limitation on reinstatement—are discriminatory. Because we affirm the district court's contempt finding on other grounds, we do not reach the issue of whether the district court could rely on Local 28's failure to meet the membership goal as evidence of contempt.

The portion of the district court's order that imposed the hiring hall and the job rotation system is reversed. The portion of that same order that awarded back pay is vacated and remanded to the district court for further proceedings, in accordance with this opinion. Because we vacate the contempt finding as to the Union's membership policies (other than the two-year limitation on reinstatement), the portion of the district court's order that modified those policies is also vacated, except that we affirm the district court's rejection of the two-year limitation period. We affirm the district court's order that the membership goal be reformulated and we affirm both the district court's

general use of ETER fund increases to coerce compliance with its orders, and its use of those increases as a remedy, but as to whether the specific increases to be proposed by the Administrator are proper as either coercive or compensatory remedies, a decision now would be premature.

The June 6 Order denying the motion to vacate the Administrator's Order is affirmed, except that we strike as overbroad the clause that directs the Contractors to cooperate "in efforts to investigate and conciliate job related complaints," and we reverse that portion of the June 6 Order which refused to vacate the Administrator's purported injunction as against the Contractors, without prejudice to the entry of an injunction, if so warranted, by the district court.

The case is hereby remanded for further proceedings in accordance with this opinion.